JS-6

cc: USBK

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **LACV 17-1756 JGB** | Date | August 6, 2020 |
|---|---|---|---|
| Title | *In re Even St. Productions Ltd., et al.* | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s):   Attorney(s) Present for Defendant(s):

None Present   None Present

**Proceedings:**   Order (1) REVERSING the Bankruptcy Court Order Releasing Royalties to Debtors; and (2) REMANDING for Consideration of Developments in the Royalties Ownership Dispute (IN CHAMBERS)

Appellants Virginia Pope ("Pope") and Majoken, Inc. ("Roberts Majoken" or "Non-debtor Majoken") (collectively "Appellants") appealed an order from the United States Bankruptcy Court for the Central District of California releasing royalties in possession of Broadcast Music, Inc. ("BMI") to co-Debtors Even St. Productions Ltd. ("Even St.") and Majoken, Inc ("Goldstein Majoken" or "Debtor-Majoken"), (collectively "Debtors" or "Appellees") and directing payment of future royalties to Debtors.[1]

The Court finds this matter appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15.  After considering the papers filed in support of, and in opposition to, the appeal, the Court REVERSES the Bankruptcy Court Order, and REMANDS for consideration of the current state of the royalties ownership dispute.

//
//
//

---

[1] Appellant Roberts Majoken is not the same as the co-Debtor Goldstein Majoken, although both are listed as "Majoken, Inc." on the docket.  Also, in a separately filed appeal that recently settled, Case No. 17-1424, BMI appealed the same decision, and the appellees there were the same as here, co-Debtors Event St. and Goldstein Majoken.

# I. BACKGROUND

## A. The Appeal

Two separate appeals were filed from the Bankruptcy Court's turnover order, ("Turnover Order," Dkt. No. 1), which involves the ownership of performance royalties. BMI, the administrator of the royalties, commenced the first appeal in February 2017, Case No. 17-CV-01424-JGB ("BMI Docket"). That appeal recently settled. (See BMI Dkt. Nos. 1, 30, 31.) The instant appeal was filed by Appellants Pope and Roberts Majoken, Case No. 17-CV-1756-JGB. The Appellees in both cases are Debtors Even St. and Goldstein Majoken.[2] In the BMI appeal, BMI filed an appendix containing the record, which the parties reference in this appeal. ("BMI Appendix," BMI Dkt. No. 12.)

Appellants filed their notice of appeal after BMI, on March 3, 2017. (Dkt. No. 1.) They filed their opening brief on June 30, 2017. ("Pope Appeal," Pope Dkt. No. 16.) Appellants filed two supplemental appendices of the record. ("Pope Appendix," Dkt. Nos. 17, 22.) Appellees responded on July 28, 2017. ("Appellee Pope Brief (APB))," Pope Dkt. No. 20.) Appellants replied on August 8, 2017. ("Pope Reply," Dkt. No. 21.)

The case involves multiple parties disputing the royalty streams from the music of Sylvester Stewart and the musical group Sly and the Family Stone. Since 2010, the parties have engaged in extensive state court litigation over the assignments and ownership of the royalties. The history of these disputes is long and complex, involving state and federal courts and private arbitration, and the Court sets forth only the relevant facts to the instant appeal. The cause of the dispute is that Stewart assigned his royalties to two different entities who are now fighting over who owns them. Appellees are Chapter 11 Debtors and they want the royalties to be available as part of their bankruptcy estate. Appellants contend the royalties are theirs and cannot be turned over as estate property. BMI is the entity that collects and distributes the royalties. It held the funds and was the target of the Turnover Order.

## B. Stewart's Seemingly Incommensurable Assignments of Royalties

To repay his debts, Stewart executed an assignment of his performance royalties ("Royalties"), which are administered by BMI, to his then-manager Ken Roberts and/or Ken Roberts Enterprises on January 30, 1976. (BMI Appendix at 489.) Under the 1976 assignment, all payments to be made by BMI were assigned to Roberts. Later, on April 10, 1979, Stewart and Roberts executed a new agreement with BMI to direct all payments to Majoken, Inc. ("Roberts Majoken") as the successor to Ken Roberts Enterprises. (Id. at 491.)

---

[2] The Pope Docket indicates that BMI is the appellee, but BMI is merely a party to this appeal and has not filed a brief. (See, e.g., Dkt. No. 1; Dkt. No. 20 (Appellees' Opening Brief, filed by Co-Debtors Event St. and Goldstein Majoken).) As noted above, the case in which BMI is an appellant has settled. (BMI Dkt. Nos. 30, 31.)

In 1983, the Internal Revenue Service (IRS) issued a levy on Stewart's Royalties. Then, in 1988, Stewart met Gerald Goldstein, another music manager. Goldstein formed Even St. Productions, Ltd. ("Even St.") to manage Stewart's career. In 1989, Stewart assigned Even St., his publishing, record, and performance royalties, the last of which are the Royalties at issue here. (Id. at 194, 509-10 (the "assignment shall include . . . [a]ny royalty or other income now due, past due, or to become due from [BMI] including but not limited to publisher's performance royalties and income").)

In 1992, Roberts Majoken dissolved and Roberts transferred the royalty payments back to himself. In 1996, the IRS tax levy on Stewart's Royalties was lifted. Goldstein then formed his own Majoken, Inc. ("Goldstein Majoken"). In August 1996, Goldstein's attorney wrote to BMI claiming his Majoken, Inc. was a loan-out corporation of Stewart and demanded the Royalties. (Pope Appendix at 23.) BMI paid Goldstein Majoken the Royalties from 1996 to 2009. (Id. at 37-38.)

In 2009, Roberts Majoken was revived. On January 7, 2010, Roberts made a declaration from the hospital that instructed BMI to pay the Royalties to Allan Law Group Professional Corporation ("Allan Law") in trust for Stewart. (BMI Appendix at 216-17, 509-10 ("I . . . hereby authorize and irrevocably instruct BMI to pay any and all performance royalties on the catalogue of "works" written or published . . . by Sly Stone to Allen Law Group . . . in Trust for [Stewart].")

**C.  State Court Litigation**

In late January 2010, Roberts and Stewart filed a state action against Goldstein, Debtors, and others for, among other claims, diversion of the performance royalties. (Id. at 395-554.) The action asserts claims against Debtors for conversion, arising from the diversion of royalties from 1996-2009. (Id.) The case wound its way up and down the state courts over the subsequent years. Of note to these appeals, on June 19, 2014, after Roberts died, the trial court ordered Pope as Roberts' successor. (Id. at 571-99.)

Two pleadings in the underlying State Court litigation are relevant: a fourth amended complaint ("4AC," id. at 395-482), and a second amended cross complaint, ("SACC," id. at 601-17). The 4AC includes claims by Roberts against Debtors for conversion arising from the diversion of performance royalties from 1996-2009, for breach of contract, and for declaratory relief. (4AC ¶¶ 282-89.) The thirty-fourth cause of action was by Roberts against BMI for breach of contract and the thirty fifth was for declaratory relief arising from those payments. (Id. ¶¶ 416-36.)

Debtors filed the SACC against Roberts. The SACC included a claim for declaratory relief that Debtors acquired right, title and interest in and to Stewart's Royalties under the 1989 assignment. (SACC ¶¶ 74-80.)

On August 19, 2014, the state court granted Roberts/Pope's motion for summary judgment on the six causes of action in the SACC , finding the 1976 assignment to Roberts was "unconditional, irrevocable and absolute." (Id. at 684-89.) The court noted that Even St. could not raise any triable issue of material fact to support the claim that it was the only rightful recipient of the Royalties. (Id.) The court also held that because the 1976 assignment was irrevocable, Stewart was unable to assign those same rights in the 1989 assignment to Even St. (Id.) The court thus held that the rightful owner of the BMI royalties from January 30, 1976 through 2009 was Roberts. (Id.) The state court did not directly address the period after the January 7, 2010 hospital bed declaration, because the 4AC included no allegations on the subject and a challenge to the declaration was being arbitrated. (Pope Appeal at 9 n.2.) The interlocutory judgment in favor of Roberts was entered on December 19, 2014. (BMI Appendix at 691-701.)

In March 2015, the trial court conducted a bench trial on the remaining claims. (BMI Appendix at 703.) The court issued two decisions. On February 24, 2016 in a Statement of Decision on Stewart's claim for declaratory relief, the court found the 1989 assignment was not void just because Stewart had assigned the royalties previously in the 1976 assignment. (Id. at 242-45.) Rather, the court found the 1989 assignment transferred "*whatever* interest he may have had tin [sic] the royalties" (italics in original). (Id. at 244.) The royalties encompassed by the 1989 assignment were those that Stewart "now has or to which the Assignor may become entitled." (Id.) Then the court stated, "The 1989 Assignment remains in effect and royalties under that assignment are owned by Even St. Productions and [Goldstein Majoken]." (Id.)

The next day, on February 25, 2016 the state court issued another Statement of Decision, on Pope's claim of conspiracy against Debtors and Goldstein. (Id. at 703-8.) The Court found in favor of the latter on Pope's claim. (Id. at 708.)

On May 10, 2016, the trial court entered final judgment. (Id. at 229.) The judgment recited that on August 19, 2014 it had granted summary judgment in favor of Pope and against Even St. on the sixth cause of action in the SACC and had rendered an interlocutory judgment in favor of Pope and against Even St. on the SACC on December 19, 2014. (Id. at 228-30.) The court then found in favor of Goldstein and Debtors on the causes of action asserted by Pope in the 4AC, declaring that she shall "take nothing" from Debtors on those claims. (Id. at 230.)

Both Debtors and Pope appealed the December 2014 interlocutory judgment and the May 2016 final judgment. A retrial was set for August 14, 2017, including the claim for declaratory relief as to who owned the present performance royalties. However, the retrial was vacated and continued.[3]

---

[3] Appellants state the retrial of claims against BMI, including a prayer to declare who owns the Royalties presently and for damages and declaratory relief regarding events in and after 2010, was scheduled to commence on August 14, 2017. (Pope Appeal at 13.) The Court notes the state court docket for California Superior Court for Los Angeles County, Case No.

In September 2016, Debtors and Stewart attended a mediation and agreed to a settlement between themselves, resolving their claims against each other. The settlement included the statement "Stewart, Debtors, and, if necessary, the Goldstein Parties shall jointly instruct BMI to deliver the BMI royalties to the Royalty Account." (BMI Appendix at 251.) The bankruptcy court approved the settlement on November 15, 2016. (Id. at 177.)

**D.  Bankruptcy Court Turnover Order**

In May 2013, Debtors filed their Chapter 11 bankruptcy petitions. (Dkt. No. 1.) On August 13, 2015, Debtors filed a motion for an order directing BMI to turn over the Royalties being held in escrow to Debtors and to pay future Royalties to Debtors. (BMI Appendix at 16-43.) The Bankruptcy Court held a hearing on September 3, 2015 on the motion, denying the motion because Debtors had "not met that burden" of establishing a "right to the funds." (Id. at 161-63.) On September 14, 2015 the Bankruptcy Court entered an order denying the motion. (Id.)

On December 22, 2016, Debtors filed a renewed motion for an order releasing the Royalties and directing payment of future Royalties to them. (Id. at 164-83.) Crucially, they sought turnover of Royalties accruing in and after 2010. (Id. at 170.) Debtors argued the January 7, 2010 Roberts hospital declaration, combined with the 1989 assignment, resulted in those Royalties being assigned to them. (Id. at 164-83.) BMI opposed the motion for turnover, (id. at 265), as did Pope, (id. at 361).

On January 12 and February 2, 2017, the court held hearings on the turnover motion. (Id. at 856, 899.) At the February 2, 2017 hearing, the Bankruptcy Court granted the motion, stating, "I think the Debtor has established that the Debtor has ownership right in these funds based on the judgments that have been entered in the state court in favor of the Debtor." (Id. 899-912.) The Court entered its Turnover Order granting the motion on February 22, 2017. BMI complied with the Order and deposited the royalties into a bank account for Goldstein Majoken. BMI and Appellants filed separate appeals.

## II.    STANDARD OF REVIEW

Federal district courts generally have jurisdiction over appeals of "final judgments, orders, and decrees" of bankruptcy courts under Title 28 U.S.C. Section 158(a). 28 U.S.C. § 158(a). A bankruptcy court's conclusions of law are reviewed de novo. In re S. Cal. Sunbelt Developers, Inc., 608 F.3d 456, 461 (9th Cir. 2010). Whether property is property of the estate is a question

---

BC430809, shows the jury trial is scheduled for October 5, 2020. See Mesa Grande Band of Mission Indians v. Salazar, 657 F. Supp. 2d 1169, 1172 (S.D. Cal. 2009) ("The Court may also properly take judicial notice, even sua sponte, of matters capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably by questioned."). This is not a fact the Bankruptcy Court would have been aware of.

of law reviewed de novo. Warfield v. Salazar, 465 B.R. 875, 877-78 (B.A.P. 9th Cir. 2012). A bankruptcy court's findings of fact are reviewed for clear error. Higgins v. Vortex Fishing Systems, Inc., 379 F.3d 701, 705 (9th Cir. 2004).

### III.  DISCUSSION

Appellants raise two arguments in their appeal: (1) the Bankruptcy Court erred in considering and ruling on the Debtor's second turnover motion, and (2) the Bankruptcy Court erred in granting the Debtor's second turnover motion. (Pope Appeal at 21, 26.) Appellees respond, first that the Court is without jurisdiction to hear these appeals. (See APB at 2-3.) They then reiterate their view that Debtors' interest in the Royalties constitutes property of the bankruptcy estate and that the Royalties were properly subject to turnover. (See APB at 20-23.)

The Court determines that it has appellate jurisdiction. The Bankruptcy Court did not abuse its discretion in considering the renewed turnover motion. However, the Court finds after de novo review that Debtors failed to establish a property right in the Royalties, the ownership of which was actively in dispute, and reverses and remands on this basis.

### A.  The Court's Appellate Jurisdiction

Appellees argue the Court lacks jurisdiction over Appellants' appeal because the Turnover Order was not a final order and is not an appealable interlocutory order. (See APB at 6.) In particular, Appellees contend the Order is not final and appealable because the Bankruptcy Court did not make "any determination" as to the ownership of the Royalties. (Id. at 2.) In fact, the Bankruptcy Court stated, "the Debtor has established that the Debtor has ownership right in these funds based on the judgments that have been entered in the state court in favor of the Debtor." (Id. 899-912.)

A final decision is typically one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." In re Frontier Properties, Inc., 979 F.2d 1358, 1362 (9th Cir. 1992) (quoting Caitlin v. United States, 324 U.S. 229, 233 (1945)). In bankruptcy, the Ninth Circuit also employs a "pragmatic" and "flexible" approach to finality. Id. at 1363. A bankruptcy order is considered final where it "1) resolves and seriously affects substantive rights and 2) finally determines the discrete issue to which is it addressed." In re SK Foods, L.P., 676 F.3d 798, 802 (9th Cir. 2012) (citing In re AFI Holding, 530 F.3d 832, 836 (9th Cir. 2008)).

Courts have held that turnover orders are final and appealable. See, e.g., In re Stasz, 520 Fed. App'x 547, 547 (9th Cir. 2013); In re Moody, 817 F.2d 365, 368 (5th Cir. 1987); In re Wengerd, 453 B.R. 243, 245 (B.A.P. 6th Cir. 2011). Appellees attempt to distinguish between turnover orders in the case law and the Turnover Order in this case by arguing it did not involve a "final determinations regarding ownership of the turned over property and did not prohibit the use of the turned over property." (APB at 3.) Appellees liken the Turnover Order to the establishment of an interpleader account, and cite only one case on interlocutory orders which did not involve a turnover at all. (Id.)

Appellees' attempts to distinguish the case law are unpersuasive. The Turnover Order considered the question of whether Debtors had more likely than not established an ownership right in the royalties, and then mandated that BMI turn the disputed funds over to Debtors as estate property. In re Kana, 478 B.R. 373, 383 (Bankr. D.N.D. 2012) (concluding the bankruptcy court's order denying the motion for turnover was a final order, because it resolved the question of whether the debtors' interest in the property must be turned over to the Trustee as estate property). Even if the Bankruptcy Court did not make a final determination on ownership of the Royalties, its Order had that effect by requiring BMI to relinquish possession of the Royalties to Debtors. Although the Order prohibited Debtors from using the Royalties without authorization by the court, the Royalties were ordered placed in a Goldstein Majoken bank account.

An order "requiring the turnover and accounting of property . . . resolves and seriously affects substantive rights." Navajo Nation v. Krystal Energy Co., Inc., 2008 WL 2477084, at *3 (D. Ariz. June 18, 2008). BMI has already complied with the Order, turning over the Royalties to Debtors. Thus, the parties do not have to engage in "protracted litigation before the . . . order will have any direct impact in the case." Mosier v. United Educ. & Software, 285 B.R. 442, 445 (C.D. Cal. 2002) (stating an order that would lead the parties into protracted litigation before having a direct impact generally does not affect substantive rights). For these reasons, the Court finds the Turnover Order releasing the Royalties to Debtors is final and appealable.

**B. The Bankruptcy Court's Decision to Consider the Motion**

Appellants contend the Bankruptcy Court should have declined to hear Appellees' second turnover motion. (Pope Appeal at 20-21.) They stress that the second motion was not based upon any new facts or law, in violation of Local Bankruptcy Rule 9013-1(l). (Id. at 21.)

A court's interpretation and application of a local rule is reviewed for an abuse of discretion. United States v. Heller, 551 F.3d 1108, 1111 (9th Cir. 2009). A bankruptcy court abuses its discretion if it applies the wrong legal standard or its findings were illogical, implausible or without support in the record. TrafficSchool.com, Inc. v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011).

In this case, the Bankruptcy Court did not abuse its discretion in applying L.B.R. 9013-1(l). Local Bankruptcy Rule 9013-1(l) requires a party making a subsequent motion for an order or relief the court has already denied in whole or in part to set forth:

> (1) The date of the prior motion; (2) The identity of the judge to whom the prior motion was made; (3) The ruling, decision or order on the prior motion; (4) The new or different facts and circumstances claimed to exist, which either did not exist or were not shown upon the prior motion; and (5) The new or different law or legal precedent claimed to exist, which either did not exist or were not shown upon the prior motion.

L.B.R. 9013-1(l).  Appellees assert their motion was brought based upon "at least three new critical facts since the first turnover motion was denied" in September 2015.  (APB at 18.)  Those three facts were: (1) the May 10, 2016 state court final judgment against the Pope Parties, (2) Stewart's settlement agreement with Debtors that the Royalties should be paid to Debtors, not to himself, and (3) Debtors' proposed reorganization in their bankruptcy cases.  (Id. at 18-19.)  Appellants contend these facts are "new desires" or "'new' in a narrow chronological sense, but not 'new' in meaning."  (Pope Appeal at 21.)

Local Bankruptcy Rule 9013-1(l) requires movants to include in any renewed motion the "new or different facts and circumstances" and "new or different law or legal precedent" that did not exist or were not shown in the earlier motion.  L.B.R. 9013-1(l).  Appellants fail to point the Court to any authority restricting the understanding of Rule 9013-1(l) to "new in meaning" facts or law.  Debtors justified their renewed motion based upon new chronological events, including a new settlement and a new state court judgment.  The Rule does not plainly prohibit a motion on these grounds.  Therefore, the bankruptcy court did not abuse its discretion by considering Debtors' second turnover motion.

## C. The Bankruptcy Court's Turnover Order

This case hinges on whether the Debtor's estate had a property right in the Royalties accrued starting January 7, 2010 and future Royalties collected by BMI.  Whether the Royalties were property of the estate to be turned over is a question of law, which the Court reviews de novo.  See In re Wharton, 563 B.R. 289, 295 (B.A.P. 9th Cir. 2017).  The Court concludes that the Bankruptcy Court erred when it decided Debtors had an ownership right in the Royalties.

### 1. Estate Property and Turnover

Once the bankruptcy petition is filed, property rights which belong to the debtor become assets of the estate.  11 U.S.C § 541(a).  Bankruptcy code defines property of the bankruptcy estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1); In re Folks, 211 B.R. 378, 384 (9th Cir. BAP 1997).  Although federal law defines estate property as including "legal and equitable interests" of the debtor, state law controls whether the debtor has a legal or equitable interest in the property at the time the bankruptcy case is filed.[4]  Butner v. United States, 440 U.S. 48, 55 (1979).  In In re Harrell, 73 F.3d 218, 219 (9th Cir. 1996), the Ninth Circuit stated that before deciding what interests of the debtor belong to the estate under Code Section 541(a), the threshold questions of the existence and scope of the debtor's interest in the property should be determined under state law.  Id.

---

[4] Property interests have an independent legal source, antecedent to the distributive rules of bankruptcy administration, that determines, in the first instance, the interests of claimant parties in particular property.  See Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15, 20 (2000); Butner v. United States, 440 U.S. 48, 55 (1979).

Turnover under 11 U.S.C. § 542 requires a noncustodial entity in possession of estate property[5] to deliver that property to the trustee, subject to certain exceptions not applicable here. 11 U.S.C. § 542(a). To support a cause of action for turnover, the trustee—or in this Chapter 11 case, the debtor-in-possession, 11 U.S.C. § 1107(a)—has the burden of proof, by a preponderance of the evidence, to establish that: (1) the property is in the possession, custody, or control of a noncustodial third party; (2) the property constitutes property of the estate; (3) the property is of the type that the trustee could use, sell or lease pursuant to Section 363 or that the debtor could exempt under Section 522, and (4) that the property is not of inconsequential value or benefit to the estate. In re Jacobson, 676 F.3d 1193, 1200–01 (9th Cir. 2012); In re Process Am., Inc., 588 B.R. 82, 98 (Bankr. C.D. Cal. 2018) (citing 5–542 Collier on Bankruptcy P 542.02 (16th Ed., 2013)). Only the second prong—that the property constitutes the property of the estate—has been questioned on appeal. Thus, the Court must examine whether Debtors established by a preponderance of the evidence a legal or equitable interest in the Royalties, and whether the property was subject to turnover.[6]

### 2. The Parties' Contentions

Appellants argue the Bankruptcy Court erred in granting Debtors' second turnover motion. They contend the Bankruptcy Court erred in finding Debtors had established ownership over the Royalties. (See Pope Appeal at 27.) Appellees counter that the Bankruptcy Court correctly held Debtors had a property interest in the Royalties. They contend the disputed property interest constitutes "property of the estate," and so the Royalties had to be turned as part of the bankruptcy proceeding. (See APB at 21-22.)

### 3. Analysis

Debtors moved for turnover of post-January 7, 2010 BMI Royalties based on their asserted "legal and equitable rights" pursuant to the 1989 assignment. (BMI Appendix at 177 (invoking Section 541 of the Bankruptcy Code) (emphasis added).) However, Section 541(a) speaks of legal or equitable "interest" and does not specify what this does or does not encompass. The next section, Section 542(a), provides for turnover not of any estate property whatsoever, but "property that the trustee may use, sell, or lease under [S]ection 363 of this title, or that the debtor may exempt under [S]ection 522." 11 U.S.C. § 542(a).

Debtors explained in their second turnover motion that BMI would not release the Royalties without an order, because the Pope Parties disputed Debtor's ownership of the

---

[5] Here, that entity is BMI, the nonprofit entity that collects the Royalties and makes payments to the owner, or as the owner directs.

[6] Appellants do not raise, and the Court does not consider, whether the Royalties were an interest "as of the commencement of the [bankruptcy case]." 11 U.S.C. § 541(a)(1).

Royalties in underlying litigation.[7]  Nevertheless, the Bankruptcy Court ordered BMI to turn over and pay to Debtors the Royalties accrued from January 7, 2010, which BMI administered and possessed, and ordered Debtors to place the funds into a segregated bank account.  (Dkt. No. 1.)  In so doing, the Bankruptcy Court did not provide its reasoning or a state-law analysis.  (Id.)  In the February 2, 2017 hearing on the turnover motion, the Bankruptcy Court stated briefly, "the Debtor has established that the Debtor has <u>ownership right</u> in these funds based on the judgments that have been entered in the state court in favor of the Debtor."  (BMI Appendix at 912 (emphasis added).)

It is unclear how the Bankruptcy Court arrived at this conclusion, and on de novo review, the Court arrives at a different result.  The state court judgments did not determine Debtors were entitled to the Royalties accrued from January 7, 2010 forward, for at least four reasons.  First, the state court judgment holding the 1989 assignment to Debtors was valid merely stated the assignment transferred "whatever" interest Roberts "may have had" in the Royalties.  (BMI Appendix at 244.)  Although the state court went on to say the "royalties under that [1989] assignment" were owned by Even St. and Goldstein Majoken, the state court did not unambiguously decide what royalties, if any, these were, or might in the future be.  (Id. at 244 (noting the royalties encompassed by the assignment were those Stewart "now has or may become entitled").)

Second, the state court's conclusions on the 1989 assignment were stated in negative terms: the 1989 assignment was deemed not unconscionable and "not void."  (Id. at 242-45).  The decision neglects to state what effect the "not void" 1989 assignment had or could have in the future.  (Id.)

Third, and most important, the referenced state court judgments did not determine any claim regarding ownership of the post-January 2010 Royalties.  Those were the only Royalties at issue in the second turnover motion, and the state court had not considered the effect, if any, of the January 7, 2010 declaration.  Yet, Debtors rely on this declaration for their theory that the Royalties necessarily pass to them.[8]

---

[7] (BMI Appendix at 178, 187, 188-89 (noting Robert's claims to pursue BMI were reinstated by the California Court of Appeal in May 2013, and that Pope and Roberts Majoken's claims against BMI to enforce Stewart's assignments were set for a new trial and that BMI may assert additional indemnification claims against Debtors, and noting Debtors had appealed the December 19, 2014 summary judgment against them and Pope had appealed the May 10, 2016 final judgment).)

[8] Debtors' theory is that Roberts's January 7, 2010 hospital bed declaration irrevocably instructed BMI to pay all future Royalties to Allan Law in trust for Stewart, and then Stewart agreed in a settlement with Debtors to pay the Royalties to Debtors.  (APB at 21.)  Appellants poke some holes in this theory that the Court need not consider here.  It is sufficient to observe that the state court judgments the Bankruptcy Court believed established Debtors' ownership rights include no reference to the January 2010 declaration.

Fourth, at the time of the Turnover Order, the status of the post-January 2010 Royalties was being litigated in state court. Just before the Bankruptcy Court's second hearing on the second turnover motion, the state court granted Pope leave to reinstate the thirty-fifth cause of action.[9] If the state court's judgment on the 1989 assignment had established Debtors' ownership rights, then it likely would not have allowed reinstatement of the thirty-fifth cause of action. In addition, the claims between Debtors and BMI had been held in abeyance. (Id. at 90-95.) Thus, the Bankruptcy Court's conclusion that "Debtor has established that the Debtor has ownership right in these funds based on the judgments that have been entered in the state court," and the issuance of the Turnover Order on this basis, were in error.[10]

Underlying the extensive litigation surrounding these Royalties are contract disputes: who assigned what rights to who and when. Turnover is the incorrect method to decide such disputes. In re Charter Co., 913 F.2d 1575, 1579 (11th Cir. 1990) ("Turnover proceedings are not to be used to liquidate disputed contract claims . . . .Clearly, Congress envisioned the turnover provision of [Section] 542 of the Code . . . to apply to tangible property and money due to the debtor without dispute which are fully matured and payable on demand.") (citations omitted); Matter of Chick Smith Ford, Inc., 46 B.R. 515, 518 (Bankr. M.D. Fla. 1985) ("[T]o extend the proposition urged by the Debtor would mean that a Debtor may collect, by way of mandatory injunction, disputed claims to monies, claims based strictly on state law which are unliquidated and contingent.").

To avoid this result, Appellees whistle the same jingle again and again: the state court held that Pope shall "take nothing." (APB at 6, 10, 11, 14, 16, 18.) That statement contributes little to the debate regarding who rightfully owns the post-January 2010 Royalties and whether turnover was appropriate. Review of the state court decision reveals a more narrow conclusion that Pope shall "take nothing" (1) as to the Goldstein parties and (2) on the basis of the causes of action asserted by Pope in the 4AC, which were for constructive fraud, fraud, conversion, and civil conspiracy, with regard to the earlier Royalties. (BMI Appendix at 230.) The judgment against Appellants did not opine on whether Debtors could take anything from BMI,[11] the entity administering the Royalties. Nor did the judgment discuss the effect, if any, of Roberts's 2010

---

[9] On January 18, 2017, before the Bankruptcy Court ruled on the second turnover motion, the state court permitted Pope to reinstate the thirty-fifth cause of action for declaratory relief as plead in the 4AC, such that the claim would cover post-2010 royalties. (BMI Appendix at 896.) That fact was before the Bankruptcy Court in a supplemental declaration filed by BMI. (Id.)

[10] To be clear, the Court does not conclude Debtors will not at some future date establish they have an ownership right, and does not weigh in one way or the other on the ultimate question of who owns the post-January 2010 Royalties. The Court simply concludes that Debtors did not establish they had that right by a preponderance of the evidence, and that the ownership rights were in dispute at the time of the Turnover Order.

[11] BMI and Debtors tolled their stated claims against one another and the trial court bifurcated the actions prior to trial. (BMI Appendix at 90-96, 905-07 (referring Debtors' standstill agreement with BMI).)

hospital bed declaration.  The state court did not contradict its earlier conclusion on summary judgment: that the 1979 assignment was absolute and irrevocable.  Moreover, at the time of the state court judgments against Appellants, the 4AC did not include allegations regarding the hospital declaration and the post-January 2010 Royalties.[12]  The judgments against Appellants, therefore, did not establish by a preponderance that Debtors had an "ownership right," (Dkt. No. 1.), in the Royalties.

Nevertheless, the Court is mindful that estate property under Section 541(a) may extend beyond undisputed rights.  Indeed, "legal or equitable interests of the debtor in property," 11 U.S.C. § 541(a) include the debtor's causes of actions.[13]  See In re Brown, 363 B.R. 591, 604 (Bankr. D. Mont. 2007) (citing Cusano v. Klein, 264 F.3d 936, 945 (9th Cir. 2001)).  Perhaps, then, the Bankruptcy Court's unstated assumption was that Appellees' estate included a disputed claim to post-January 2010 Royalties.  If that was the theory, however, nobody mentioned whether the cause of action was scheduled, when it accrued, or whether debtors can use turnover motions to obtain disputed funds that are the object of the "cause of action" property interest.  See In re Smith, 293 B.R. 786, 788 (Bankr. D. Kan. 2003) (noting that a later recovery on the claim is derivative of the cause of action and therefore becomes property of the estate); In re Ballard, 238 B.R. 610, 624 (Bankr. M.D. La. 1999).

As best the Court can tell, the Bankruptcy Court only considered whether a definite vested right to the Royalties was established, not whether a more nebulous "interest," "cause of action," or contingent future recovery was the relevant estate asset.  Before the Bankruptcy Court, Appellees repeatedly asserted they had an undisputed right to the Royalties. (BMI Appendix at 36, 862 (asserting the Royalties were themselves property the trustee could use sell or lease under 11 U.S.C. § 363 and representing to the Bankruptcy Court that there was "no dispute at all" as to the Royalty funds themselves); id. at 177 (asserting in their second turnover motion that Appellees have legal and equitable "rights" and are "entitled" to receive BMI Royalties).)

---

[12] The Court also observes the settlement approved by the Bankruptcy Court between Debtors and Stewart is inapposite.  The agreement did not include BMI, nor did it resolve the Pope Parties' claims to the BMI Royalties.  Debtors themselves do not possess any judgment against BMI establishing either their or the estate's right to the BMI Royalties.

[13] Since litigation rights are property of the estate (for example, a litigation right against BMI), they may be sold under Section 363. In re Atl. Gulf Communities Corp., 326 B.R. 294, 299–300 (Bankr. D. Del. 2005) (citing 11 U.S.C. § 363(b)).  The sale of a litigation claim, however, does not entitle the assignee to collect in contravention of any defenses to that claim; all that is conveyed is the right to prosecute the action and collect any potential judgment.  See, e.g., Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V., 209 F.3d 252, 261 n. 11 (3d Cir. 2000) (holding that affirmative defenses to cause of action are not claims extinguished by a section 363(f) sale in bankruptcy).  The conditional, future, speculative, or equitable nature of an interest does not prevent it from becoming property of the bankruptcy estate.  In re Anderson, 128 B.R. 850 (D.R.I. 1991).

Now, on appeal, Appellees backpedal, and argue that the relevant property was only a "contingent and disputed" legal "interest." (APB at 22.) First, arguments raised for the first time on appeal are disfavored and may be disregarded. In re Jan Weilert RV, Inc., 315 F.3d 1192, 1199 (9th Cir.), amended, 326 F.3d 1028 (9th Cir. 2003). Second, even if causes of action are legal interests that become estate property, Appellees do not cite authority for their proposition that funds that are the object of a cause of action property interest can be turned over pursuant to Section 542(a). That Section allows for turnover of property that can be used, sold, or leased under Section 363. When a cause of action is sold under Section 363, presumably it is the ability to prosecute the claim that is sold—not the claimed funds or title to property themselves, which may or may not ultimately be recovered.

One of Appellees' authorities, In re Kane, 628 F.3d 631, 641 (3d Cir. 2010), illustrates the problem. (APB at 22.) Ms. Kane filed for bankruptcy, was in divorce proceedings, and she had a legally cognizable interest in the equitable distribution of marital property. 628 F.3d at 641. The Third Circuit explained that Ms. Kane had an "interest" in the equitable distribution, "but she did not have a right to it. Her claim qualified as a contingent, equitable interest . . . that could not ripen into a vested property interest—i.e. a tangible asset—until entry of a judgment of divorce." 628 F.3d at 641. The court noted such claims should be scheduled, but did not require turnover of the anticipated equitable distribution in advance of the divorce judgment. No equitable distribution asset existed as a freestanding property right, and the property was at best an inchoate right. 628 F.3d at 642 (citation omitted). Applying In re Kane to the facts here, the Court finds Appellees had a at most a colorable claim to the post-January 2010 Royalties. Appellees did not have the outright "ownership right" they claimed and that the Bankruptcy Court found. (Dkt. No. 1; BMI Appendix at 899-912.)

Appellees also reference In re Atl. Gulf Communities Corp., 326 B.R. 294, 300 (Bankr. D. Del. 2005). (APB at 22.) This case helpfully remarks that litigation rights are the property of the estate and may be sold under Section 363. (Id.) If the case applied here, Debtors would have attempted to auction off their claim to the Royalties, not the Royalties themselves. The case does not stand for the proposition that contingent litigation claims may be liquidated by a bankruptcy court prior to the entry of judgment by means of a turnover order. "The sale of a litigation claim, [] does not entitle the assignee to collect . . . ; all that is conveyed is the right to prosecute the action and collect any potential judgment." Id. (emphasis added). Here, Appellees never argued to the Bankruptcy Court that they had a merely contingent claim that they wished to sell or assign. They sought turnover of the Royalties, even though they had no judgment against BMI. As a result, the order to release Royalties to Debtors—even as the ownership of the post-January 2010 Royalties was in dispute and an active subject of litigation in state court—was in error. In re Gurga, 176 B.R. 196, 199 (9th Cir. BAP 1994) ("Turnover proceedings involve return of undisputed funds.") (emphasis in original).

//
//
//
//

## IV.    CONCLUSION

In sum, the Turnover Order releasing the Royalties to Debtors is REVERSED because the Court finds the ownership of the Royalties was not established by a preponderance of evidence and the funds were in dispute.  Given the passage of more than three years since the Turnover Order, the Court REMANDS to the Bankruptcy Court to examine the state of the Royalty ownership dispute.

**IT IS SO ORDERED.**